IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Michael Marzillo, | ) |
| Plaintiff, | ) |
| v. | ) Case 15 CV 1572 |
| United Auto Workers Local 551; Ford Motor Company; Grant Morton; Alan "Coby" Millender; Greg Poet; and International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, | ) |
| Defendants. | ) |

MEMORANDUM OPINION AND ORDER

In this action, plaintiff Michael Marzillo, an employee of defendant Ford Motor Company and a Union Representative at United Auto Workers Local 551 (the "Local Union"), sues the Local Union; its past and present Chairmen, Morton and Millender; the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"); UAW employee, Greg Poet; and Ford. He asserts a "hybrid action" against the Local Union (for breach of the implied duty of fair representation) and Ford (for breach of contract) (Counts I and

II, respectively)[1]; seeks injunctive relief (Count III); and complains of tortious conduct including civil conspiracy (Count IV); tortious interference with contract (Count V); and unfair labor practices (Count VI) by all defendants. Defendants have moved to dismiss some or all of these counts. For the following reasons, the motions are granted.

I.

Plaintiff has been an elected representative of the Local Union at Ford's Torrence Avenue facility in Chicago, Illinois since August of 2004, and he has been reelected with the substantial support of the Local Union's Skilled Trades Group since then.[2] At a meeting held in October of 2011, officers of UAW presented the Local Union with a proposed contract between UAW and Ford. Defendant Morton, who at that time was Chairman of the Local Union, had promised defendant Poet, an officer of UAW, that he--Morton--would deliver a favorable vote on the proposed contract from the Torrence Avenue facility. Plaintiff, however, believed that the proposed contract was unfavorable to his membership, and he spoke out against it at the October

---

[1] *See Nemsky v. ConocoPhillips Co.*, 574 F.3d 859, 864 (7th Cir. 2009) (in a "hybrid 301" action, plaintiff asserts claims under Section 301 of the LMRA against the union for breaching its duty of fair representation and against the employer for breaching collective bargaining agreement).

[2] As is appropriate at the motion to dismiss stage, I accept all well-pleaded facts in the complaint as true. *See Jones v. General Elec. Co.*, 87 F.3d 209, 211 (7th Cir. 1996).

meeting. Ultimately, the contract was approved by a majority of Ford workers, but it was voted down at the Torrence Avenue facility.

Sometime shortly thereafter, Morton confronted plaintiff in his office and complained that plaintiff and other union representatives who had criticized the contract had "embarrassed" Morton at the October meeting. From that day forward, plaintiff alleges, Morton and other Local Union officials devised and carried out a scheme to punish plaintiff for being "out of line" at the meeting by reducing plaintiff's overtime hours. Plaintiff claims that the reduction in his overtime violates provisions of both the Collective Bargaining Agreement (the "CBA") and a 1995 Letter of Understanding (the "1995 Letter") between UAW and Ford relating to the allocation of overtime work by full-time union representatives. In addition, plaintiff claims, Morton reduced plaintiff's area of responsibilities and cut his representative group in half by forming two separate Skilled Trades groups and assigning one of them to another Local Union representative.

Plaintiff began filing grievances challenging the unfair allocation of overtime in or around April of 2012. Ford's Human Resources Representative allegedly participated in these grievance proceedings and "took the position that such matters were within the exclusive discretion" of the Local Union's

3

Chairman. For their part, Chairmen Morton and Millender (the latter became the Local Union Chairman in June of 2013) have refused, in bad faith, to equalize plaintiff's overtime hours "because of [plaintiff's] political affiliation and because [plaintiff] had criticized the proposed International contract." Accordingly, plaintiff's grievances were either denied or never adjudicated, and his attempts to appeal have been fruitless. Indeed, plaintiff complains that the grievance procedure is "circular" because it requires that appeals be "made to the very same Chairman of whom the complaint is being made."

To "get past the logjam" in his grievance process, plaintiff wrote a letter to UAW's president in November of 2013. In that letter, plaintiff invoked the 1995 Letter and stated that he wished to "appeal and complain of the denial or deemed denial of" his grievances regarding overtime allocation. Cmplt. Exh. 1. In response, plaintiff received a letter stating that his appeal was "premature," and advising him that he must first exhaust the grievance procedure set forth in the UAW Constitution. Plaintiff attempted to follow the designated process, but no resolution of his grievances was forthcoming.

Sometime between April and July of 2014, plaintiff requested a report on the status of his various grievances from Regional International Servicing Representative, Tony Tallarita. Tallarita determined that plaintiff had between twenty-three and

thirty-two unresolved grievances, and he advised plaintiff to bring his complaints about unequal overtime allocation to the UAW National Ford Department, pursuant to the 1995 Letter. So plaintiff wrote to the UAW National Ford Department for a second time on August 1, 2014, again invoking the 1995 Letter and complaining "that the representative overtime opportunities have not been fairly distributed." Cmplt., Exh. 6. Plaintiff attached the 1995 Letter to this letter and also quoted its provision that complaints about overtime distribution "may be brought to the attention of the UAW National Ford Department and the U.S. Union Affairs Office, Ford Automotive Operations, Employee relations, for review and resolution as the national parties deem appropriate." *Id.*

Defendant Poet responded to plaintiff's August 1, 2014, letter, stating, "[a]fter further investigation, I found that the Local 551 Plant Chairman has committed to equalizing you with the other district committee. The spreads are within twenty-five (25) hours as of week ending September 21, 2014." Cmplt., Exh. 7. Plaintiff claims that this letter does not resolve his outstanding grievances, however, and that payroll records from the Torrence Avenue facility reveal an inequitable allocation of overtime hours. He now seeks unpaid overtime compensation, profit sharing, and other benefits in excess of $300,000.

II.

With respect to the allocation of overtime hours, the CBA provides:

> **Section 13. Provisions Applicable to Full-time Representatives**
>
> ****
>
> **(b) Hours on Company Time**
>
> ****
>
> (2) Monday through Friday, excluding holidays, all other elected representatives shall be scheduled to represent employees on the basis of their representation functions and a proportionate amount of the overtime worked by the employees in the Unit on such days when less than all are scheduled to work. Such overtime shall be determined and authorized weekly by totaling the Monday through Friday overtime worked in the Unit during the preceding week, excluding holidays and periods when all employees were scheduled to work, and multiplying that total by .01. Appointed representatives will receive overtime hours equivalent to the average hours authorized for elected representatives. The Chairperson will be notified of the Unit's Monday through Friday overtime allocation and will establish the daily work schedule for all representatives and provide it to a designated Company representative.
>
> ****
>
> (3) . . . The Unit Chairperson will be notified of and will establish the Unit's Saturday, Sunday or holiday work schedule for representatives and provide it to a designated Company representative.

Ford's Mem., Exh. A.[3]

---

[3] Ford states, and plaintiff does not dispute, that although two CBAs were in force during the period encompassed by plaintiff's claims, they are identical in all relevant respects. Plaintiff raises no objection to my consideration of the document Ford

The 1995 Letter explains that Article VI, Section 13(b) of the CBA, from which the foregoing is excerpted, "describes the process for determining the weekly allocation of overtime hours for union representatives." Cmplt., Exh. 9. The 1995 Letter goes on to:

> confirm the parties' understanding that these provisions contemplate that insofar as practical such overtime opportunities would be rotated by the chairperson among the representatives, depending upon their specific representation functions and the representation requirements in the unit, with the objective of equalization within reasonable limits over a period of time (e.g., quarterly or semi-annually).
>
> In this regard, complaints that representative overtime opportunities are not being fairly distributed may be brought to the attention of the UAW National Ford Department and the U.S. Union Affairs Office, Ford Automotive Operations, Employee Relations, for review and resolution as the national parties deem appropriate.

*Id*.

In Count I of the complaint, plaintiff claims that the Local Union, Morton, and Millender breached their duty of fair representation under Section 301 of the LMRA by failing to equalize his overtime allocations pursuant to the CBA and the 1995 Letter, and by failing to represent him in the grievance procedures.[4] In Count II, plaintiff claims that Ford was aware

---

represents as the earlier of the two CBAs and attaches as Exhibit A to its memorandum.

[4] In his combined response to defendants' motions to dismiss, plaintiff concedes that Morton and Millender cannot be held

that plaintiff was not receiving an equalized share of overtime, yet "failed to manage or require its employee, the Chairman of UAW Local 551, to comply with the CBA," and failed to take disciplinary action against the Chairman.

Count III is captioned "Injunctive Relief" and seeks an order directing Ford to "exercise its management authority to order that overtime hours...be equalized," and to "enforce the CBA and honor the rights of Union Representatives to equalized overtime pay." Plaintiff further requests, "should Ford or Millender" fail to equalize his overtime, "that an independent third party be appointed to assign and equalize overtime hours among the Union Representatives."

Counts IV-VI assert various torts against all defendants. In Count IV, plaintiff claims defendants were aware that plaintiff was not receiving equalized overtime, and that they conspired to deny plaintiff "and other dissident Union Representatives their right to receive equalized overtime" under the CBA and the 1995 Letter, including by developing "a maze of conflicting routes of appeal, giv[ing] false information to complaining representatives about their appeal rights, [and] fail[ing] to enforce the terms and conditions of the CBA and the

---

individually liable for any breach of the duty of fair representation. Accordingly, Count I is dismissed as to them, but it remains pending against the Local Union, whose motion does not challenge its adequacy.

1995 Letter Agreement." In Count V, plaintiff asserts that defendants' conduct amounts to tortious interference with plaintiffs' rights under the CBA and the 1995 Letter Agreement. Finally, in Count VI, he claims that the conduct described in the complaint amounts to an unfair labor practice.

Ford seeks dismissal of all counts against it, which is to say, every count but Count I. Ford argues that Count II must be dismissed because the CBA expressly delegates to the Local Union Chairperson exclusive authority to assign overtime to union representatives. Accordingly, Ford had no authority to compel Morton, Millender, or the Local Union to equalize plaintiff's share of overtime. Additionally, Ford argues that I lack jurisdiction to order the injunctive relief plaintiff seeks in Count III, and that his state law claims must be dismissed because they are preempted by Section 301 of the LMRA or the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151, *et seq*. Because all of these arguments, except the first, are echoed by other defendants (some of whom also assert additional bases for dismissal), I begin with Ford's motion.

Ford begins with the premise that the scope of its authority is defined and cabined by the terms of the CBA. Ford then points to provisions in the CBA delegating the duty to "establish the daily work schedule for all representatives," and to "establish the Unit's Saturday, Sunday or holiday work

9

schedule for the representatives" to "[t]he Chairperson [of the Local Union]." Ford's Mem., Exh. A, CBA Art. VI, §§ 13(b)(2) and (b)(3). Ford asserts that these provisions expressly vest authority for work scheduling exclusively in the Local Union's Chairman. Moreover, Ford notes, the 1995 Letter likewise provides that "*the chairperson [will] establish the daily work schedule for the unit committee*," and that overtime opportunities "would be rotated *by the chairperson* among the representatives." Cmplt., Exh. 9 (emphasis added). Together, Ford contends, the CBA and the 1995 Letter make clear that Ford has no power to direct or control the distribution of overtime hours among full-time Union Representatives, as UAW expressly retained authority over overtime allocation.

Plaintiff acknowledges that the CBA and 1995 Letter delegate responsibility for scheduling to the Local Union's Chairman, *see* Pl.'s Opp. at 11, but in his view, the terms of the 1995 Letter providing that complaints about overtime distribution "may be brought to the attention of the UAW National Ford Department and the U.S. Union Affairs Office, Ford Automotive Operations, Employee relations, for review and resolution as the national parties deem appropriate" establishes a substantive duty on Ford's part to "enforce equalization." *Id*. at 7. This construction is at odds, however, with the 1995 Letter's immediately preceding provisions, which expressly

10

convey authority for establishing work schedules and rotating overtime opportunities to the local union chairperson. At best, the provision plaintiff points to establishes a procedure for alerting Ford and UAW to local disputes about overtime allocation, which the "national parties" may review and resolve as they "deem appropriate." Cmplt., Exh. 9. Indeed, plaintiff invoked that procedure here. It is true that he claims his initial effort to follow the procedure was mishandled (by UAW; not by Ford), and that its substantive outcome--Poet's letter stating that "the Local 551 Plant Chairman has committed to equalizing you with the other district committee"--was unsatisfactory. But the essence of plaintiff's claim against Ford is not that Ford failed to follow the procedure established in the 1995 Letter, but instead that Ford should have "enforced" a different substantive allocation of overtime. Because it is clear from the face of the CBA and 1995 Letter that Ford had no authority to do so, plaintiff's claim for breach of contract against Ford fails as a matter of law.[5]

---

[5] Curiously, plaintiff attaches to his complaint a decision of the American Arbitration Association in another case involving Ford, in which the panel rejected the very claim plaintiff asserts against Ford here: that it breached the CBA by failing "to properly supervise [the local Chairman] and correct his errors in the assignment, rotation and equalization of Union overtime" pursuant to the same 1995 Letter of Understanding at issue here. The panel examined the language of the 1995 Letter and concluded that "[a]ny fair reading of the CBA in this case reveals that the parties clearly shifted the exclusive right to

11

Ford's next argument, echoed by several other defendants, is that Count III, which seeks to enjoin Ford to equalize plaintiff's overtime, must be dismissed because the Norris-LaGuardia Act, 29 U.S.C. § 101, et seq., divests federal courts of jurisdiction to enter an injunction of the sort plaintiff requests. The anti-injunction provisions of the Norris-LaGuardia Act state:

> No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following acts:
>
> * * * *
>
> (c) Paying or giving to, or withholding from, any person participating or interested in such labor dispute . . . moneys or things of value.

The parties agree that "the critical element in determining whether the provisions of the Norris-LaGuardia Act apply is whether the employer-employee relationship [is] the matrix of the controversy." *Jacksonville Bulk Terminals, Inc. v. International Longshoremen's Association*, 457 U.S. 702, 712

---

assign, rotate and equalize Union overtime hours to the Union, and specifically the Unit Chairperson. The Employer retained no control over the assignment, rotation and equalization of Union overtime hours and opportunities." Cmplt., Exh. 8. Obviously, I am not bound by that decision, but my independent review of the letter leads me to the same conclusion.

(1982) (internal quotation marks and citation omitted) (original alteration). That is the case here, Ford argues, because the employer-employee relationship is the *only* relationship it has with plaintiff. Moreover, Ford points out, plaintiff's claim that defendants breached the overtime provisions of the CBA falls squarely within the statutory definition of a "labor dispute," which broadly encompasses "any controversy concerning the terms or conditions of employment...regardless of whether or not the disputants stand in the proximate relation of employer and employee." 29 U.S.C. § 113(c). Indeed, the Supreme Court "has consistently given the anti-injunction provisions of the Norris-LaGuardia Act a broad interpretation, recognizing exceptions only in limited situations where necessary to accommodate the Act to specific federal legislation or paramount congressional policy." *Jacksonville Bulk Terminals*, 457 U.S. at 708.

Plaintiff does not claim that either federal legislation or paramount congressional policy exempts his claims from the broad scope of the Norris-LaGuardia Act's anti-injunction provisions. Instead, he argues that, "[w]hen an action involves a dispute over work assignments, the Norris LaGuardia Act is inapplicable." Pl.'s Opp. at 9 (citing *Burkholder v. Local 12, International Union United Automobile, Aerospace and Agricultural Implement Works of America, Local No. 12,* 444 F.

13

Supp. 2d 817, 820 (N.D. Ohio, 2006) and *Drywall Tapers & Pointers of Greater New York, Local 1974 v. Operative Plasterers' & Cement Masons' Int'l Ass'n*, 537 F.2d 669, 674 (2d Cir. 1976)). But plaintiff's cited authorities do not support his sweeping proposition, nor do they persuade me that his claims fall outside the Norris-LaGuardia Act's broad scope.

In *Burkholder*, the plaintiffs were machine repairmen at an auto plant who sued their local union, claiming the union had breached its duty of fair representation "by allocating a disproportionate amount of work previously done by machine repairmen [to] electricians and millwrights." *Id*. at 819. The court held that the Norris-LaGuardia Act did not deprive it of jurisdiction to enter a preliminary injunction (though it declined to issue the injunction on other grounds), concluding that "the dispute at issue here does not involve the employer-employee relationship, but rather the relationships between employees at the plant." *Id*. at 820. Unlike in this case, however, the plaintiffs in *Burkholder* did not sue their employer, DaimlerChrysler,[6] nor did their claims arise out of an alleged breach of the CBA between the employer and the union.

---

[6] DaimlerChrysler was subsequently joined as a defendant by the union. The plaintiffs' later-filed Third Amended Complaint named DaimlerChrysler as a defendant, but they made no allegations against DaimlerChrysler. *See Burkholder v. International Union*, 299 F. App'x 531, 532 (6th Cir. 2008).

14

The dispute in *Drywall Tapers* was even further removed from the Norris-LaGuardia Act's definition of a "labor dispute." That case involved a turf war between two unions—the "Plasterers" and the "Painters"—over whether a particular aspect of construction work fell within the province of one or the other. 537 F.2d at 671. The plaintiffs claimed that pursuant to a certain memorandum between the unions, the work in question was within their jurisdiction, while the defendants contested the viability of the memorandum. The court held that the Norris-LaGuardia Act did not bar jurisdiction to enter an injunction, concluding that "the injunctive relief sought here will not infringe upon the workers organizational or bargaining rights but will instead enforce a work assignment agreement negotiated by the unions themselves." *Id*. at 673-74. The same cannot be said here, where the union negotiated with Ford, the employer, for the right to distribute overtime among its representatives. The injunction plaintiff seeks directing Ford to reallocate his overtime hours would directly infringe upon that right.

In short, while plaintiff is correct that the Norris-LaGuardia Act's anti-injunction provisions are not absolute, I conclude that their broad scope encompasses the claims plaintiff asserts here because they arise out of, and are inextricably linked to, agreements between plaintiff's union and his

15

employer. Accordingly, I have no jurisdiction to order Ford—the only party whose actions Count III explicitly seeks to enjoin—to "equalize" plaintiff's overtime allocation. Moreover, even assuming Count III could be construed as seeking an injunction against Millender (as plaintiff evidently intended, *see* Pl.'s Mot. for Hearing at 2 (DN 22)), plaintiff's claims against Millender are equally grounded in rights flowing from the CBA and the 1995 Letter. Accordingly, the employer-employee relationship remains "the matrix of the controversy." *Jacksonville Bulk Terminals,* 457 U.S. at 712. *See also* 29 U.S.C. § 113(c) ("labor dispute" not limited to those in which "the disputants stand in the proximate relation of employer and employee").[7]

This brings me to plaintiff's claims in Counts IV-VI for civil conspiracy, tortious interference with contract, and unfair labor practices. Ford and other defendants argue that each of these claims is preempted by Section 301 of the LMRA, citing *Kimbro v. Pepsico, Inc.,* 215 F.3d 723 (7th Cir. 2000),

---

[7] To the extent Count III seeks the appointment of an independent third party to determine the proper allocation of overtime in the event plaintiff prevails on the substance of his claims, that request is not properly characterized as an "injunction." *See Jamie S. v. Milwaukee Public Schools*, 668 F.3d 481, 491 (7th Cir. 2012) (appointment of independent monitor did not amount to an injunction because it did not "grant relief on the merits or substantively alter the parties' legal relationship," nor did it "require the parties to do or refrain from doing anything *at all*.") (Original emphasis).

and that Count VI (unfair labor practices) is additionally preempted by the NLRA. With respect to Section 301 preemption, *Kimbro* made clear that when a worker is covered by a collective bargaining agreement, he must litigate any legal dispute with his employer as a breach of that contract under Section 301. 215 F.3d at 725. The *Kimbro* court further held that a plaintiff may not "recharacterize his claim as one of tort law in order to circumvent the exclusive jurisdiction of federal law over claims for breach of a collective bargaining agreement," noting specifically that "[o]ne of the forbidden recharacterizations is recasting a breach of contract suit as a suit for tortious interference with contract." *Id.* at 725-26. I agree that that is what plaintiff has done here.

With respect to his civil conspiracy and tortious interference with contract claims, plaintiff insists that state tort remedies remain available "as long as the state-law claim can be resolved without interpreting the [collective bargaining] agreement itself." Pl.'s Opp. at 13 (citing *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 410 (1988). That may be true, but the argument rings hollow in this case because the CBA (and the 1995 Letter) is the very source of the rights plaintiff claims defendants violated. *See, e.g.,* Count IV ¶ 134 (defendants "have denied overtime, denied grievances, given false or incorrect advice regarding appeal rights and refused to

17

abide by the 1995 Letter Agreement relative to the assignment of overtime among Union Representatives as a cudgel to suppress dissident representation"); Count V ¶¶ 151, 153 ("the CBA and the 1995 Letter Agreement created certain contractual rights and benefits for MARZILLO to be assigned overtime hours and receive overtime pay for such overtime hours worked" and that defendants "tortiously interfered with Marzillo's receipt of such contractual benefit"). Claims grounded in these and similar allegations plainly cannot be adjudicated without reference to the CBA and the 1995 Letter, and thus do not fall within the *Lingle* exception to Section 301's field preemption.[8]

Plaintiff's response to defendants' arguments for dismissing his claim for unfair labor practices only reinforces that that claim is likewise preempted. Several defendants assert that the NLRA preempts his claim for unfair labor practices and further vests exclusive jurisdiction over the claim in the National Labor Relations Board. Plaintiff concedes

---

[8] Ford raises the additional argument that a party generally cannot tortiously interfere with its own contract, citing *Douglas Theater Corp. v. Chicago Title & Trust Co.*, 681 N.E. 2d 564, 567 (Ill. App. Ct. 1997). That principle likewise dooms Count V as to both Ford and UAW. *Swager v. Couri*, 395 N.E. 921 (Ill. 1979), which plaintiff cites for the proposition that claims alleging malice are excepted from this rule, is inapposite, as it addressed when actions taken by corporate officers, directors and shareholders can be deemed to have interfered with the corporation's contracts. In any event, plaintiff's allegations do not raise a plausible inference of malice on Ford's part.

that his allegations articulate "a violation of the National Labor Relations Act," but he argues that because they also state "a breach of the parties' collective bargaining agreement...the NLRB and the district court share concurrent jurisdiction." Pl.'s Opp. at 19 (citing *Local Union No. 884, United Rubber, Cork, Linoleum, & Plastic Workers of Am v. Bridgestone/Firestone, Inc.*, 61 F.3d 1347, 1356 (8th Cir. 1995). Even if plaintiff's jurisdictional argument is correct, however, it merely emphasizes that his claim essentially arises out of the CBA and is thus preempted by Section 301.

III.

For the foregoing reasons, Count I is dismissed as to the individual defendants but remains pending against the Local Union. All other counts are dismissed in their entirety.

**ENTER ORDER:**

_____

**Elaine E. Bucklo**
United States District Judge

Dated: October 6, 2015